# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FT. MYERS DIVISION

SANDRA NICHOLS,

                **Plaintiff,**

-vs-                                     **Case No.  2:11-cv-664-FtM-DNF**

COMMISSIONER OF SOCIAL SECURITY,

                **Defendant.**

_____/

## OPINION AND ORDER

Plaintiff, Sandra Nichols, seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for a period of Disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI").  The Commissioner filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties filed legal memoranda in support of their positions.  For the reasons set out herein, the decision of the Commissioner is Affirmed pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## I.      Social Security Act Eligibility, Procedural History, and Standard of Review

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § § 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable

to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § § 404.1505-404.1511.

### A.    Procedural History

On September 5, 2008, Plaintiff filed applications for a period of Disability, Disability Insurance Benefits and Supplemental Security Income, alleging a disability onset date of July 31, 2003. (Tr. 160-164). Plaintiff's applications were initially denied on January 8, 2009, and upon reconsideration on March 27, 2009. (Tr. 100-106, 109-113). On May 8, 2009, Plaintiff filed a Request for Hearing by an Administrative Law Judge. (Tr. 114-115). The hearing was held on January 6, 2011, where testimony was heard from Plaintiff, a Medical Expert ("ME"), and a Vocational Expert ("VE") . (Tr. 123-135). By a decision dated March 25, 2011, the ALJ determined Plaintiff was not disabled and thus not entitled to DIB or SSI. (Tr. 17-29). On May 27, 2011, Plaintiff submitted a Request for Review of the ALJ's Decision. (Tr. 16). The Appeals Council denied Plaintiff's Request for Review on August 3, 2011, finding there was no reason under the rules to review the decision. (Tr. 4-8).

### B.    Standard of Review

The scope of this Court's Review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richards v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate support to a conclusion." *Crawford v. Comm'r*, 363 F.3d 1155, 1158 (11th Cir. 2004) (citing *Lewis v. Callahan*, 125 F.3d 1426, 1439 (11th Cir. 1997); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990)).

In evaluating whether a claimant is disabled, the ALJ must follow the five step inquiry described in 20 C.F.R. §§ 404.1520(a), 404.920(a). In the first step the ALJ will consider if the claimant has engaged in any substantial gainful activity. 20 C.F.R. §404.1520(a)(4)(i). If the claimant is found to be engaging in substantial gainful activity she is not disabled. 20 C.F.R. §1520(b).

The second step requires the ALJ to evaluate the severity of the impairment(s) the claimant is alleging. 20 C.F.R. §1520(a)(4)(ii). If the claimant's impairment(s) does not significantly limit her physical or mental ability to do basic work activities, the ALJ will find that the impairment is not severe, therefore the claimant will be found not disabled. 20 C.F.R. §1520(c).

The third step of the evaluation also considers the severity of the impairment(s). 20 C.F.R. §1520(a)(4)(iii). If the claimant's impairment(s) meets the duration requirement and is listed in appendix 1, or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. §1520(d).

At the fourth step, the ALJ will consider the claimant's residual functional capacity and her past relevant work. 20 C.F.R. §1520(a)(4)(iv). If the claimant can still do her past relevant work then she will not be found disabled. *Id*.

The fifth step considers the residual functional capacity as well as the age, education, and work experience of the claimant to see if she can make an adjustment to other work. 20 C.F.R. §1520(a)(4)(v). If the claimant is able to make an adjustment she will not be found disabled. *Id*. The Plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as fact finder, and even if the reviewer finds that a preponderance of evidence goes against the Commissioner's decision. *Miles v. Chater*, 84 F.3d

1397, 1400 (11th Cir. 1996). The District Court may not " . . . decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Id*. (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

## II.     Review of Facts

### A.     Background Facts

At the time of the hearing Plaintiff was forty-eight (48) years old. (Tr. 58). Plaintiff is single with one minor child, age seven (7). *Id*. Plaintiff is a high school graduate and also attended a computer certification school but did not complete the program due to the school going bankrupt. *Id.* Plaintiff worked most consistently in the years ranging from 1998 through 2003, she had some income in 2004, and also made less than two-thousand dollars in 2007 and 2008 respectively. (Tr. 59).  Plaintiff's past relevant work includes working as a waitress, hostess, prep cook, cashier and working in a deli. (Tr. 60-61). Plaintiff's alleged disability began on July 31, 2003. (Tr. 160). Plaintiff alleges the following disabling conditions: Hepatitis C, Rheumatoid Arthritis, cellulitis in both legs, bipolar disorder, depression, atrial fibrillation, hypothyroidism, IBS, colon blockage, stomach (abdominal) pain and lichen sclerosus. (Tr. 232).

### B.     The ALJ's Findings

At step one, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2009. (Tr. 22). Although Plaintiff has worked after her alleged onset date of July 31, 2003, the ALJ found that it did not rise to the level of substantial gainful activity according to Plaintiff's Work Activity Report. *Id*.

At step two, the ALJ found Plaintiff had the following severe impairments: Depression, Personality Disorder, Fibromyalgia, and Hepatitis C. (Tr. 22). The ALJ made these findings after reviewing all of the medical evidence, and determined that these impairments cause "more than minimal functional

-4-

limitations," and are therefore considered "severe" as defined by the Social Security Regulations. *Id.*

At step three, the ALJ found Plaintiff does not have an impairment or combination of impairments that meet or medically equals one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 22). In making his findings, the ALJ considered whether the "paragraph B" and "paragraph C" criteria of listing 12.04 were met. (Tr. 22-23). The ALJ found Plaintiff did not meet the "paragraph B" criteria because the Plaintiff's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration. (Tr. 23). The ALJ explained that a "marked" limitation was one that was "more than moderate but less than extreme." (Tr. 26). The ALJ found Plaintiff did not meet the "paragraph C" criteria of section 12.04. (Tr. 23). The ALJ explained:

> [She] does not have a medically documented history of a chronic affective disorder of at least two years duration that has caused more than minimal limitations of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: repeated episodes of decompensation, each of extended duration; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate;  or current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. *Id.*

At step four, the ALJ found Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b), except she is limited to occasional postural activities and only frequent use of the upper extremities, she cannot power grasp or torque, she has ninety percent of the concentration, persistence, and pace of the average worker, and is moderately limited in appropriate social functioning. (Tr. 23-24). The ALJ explained that Plaintiff alleges that her combined impairments result in swollen hands, anxiety, and an inability to get out of bed, sit, lift or be around people. *Id.* After careful consideration of the evidence, although the ALJ found that Plaintiff's impairments

could reasonably be expected to cause the alleged symptoms, the ALJ did not find Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms credible. *Id.* The ALJ stated that Plaintiff's credibility is undermined by her minimal work history prior to her disability onset and a history of drug and alcohol abuse and criminal charges. *Id*. Plaintiff's credibility was also undermined by her tendency to exaggerate and misrepresent her medical conditions, including statements to consultative examiners implying continuing life-threatening atrial fibrillation despite no medical evidence indicating a recurrence after medication. *Id*. Overall, the ALJ found that Plaintiff's limitations are milder than those alleged by her. (Tr. 24-27).

At step five, the ALJ found Plaintiff was able to perform her past relevant work as a waitress and cashier. (Tr. 27). The ALJ consulted an impartial VE who testified that Plaintiff's past work as light and concluded that she was able to perform it as actually and generally performed. *Id.*. The VE testified that given Plaintiff's age, education, work experience, and RFC she would be able to perform the requirements of representative occupations such as cleaner and mail room sorter. (Tr. 28). Thus, the ALJ concluded that during the alleged disability period of July 31, 2003, through the date of his decision Plaintiff was not disabled. (Tr. 29).

### C.    Plaintiff's Medical History

According to Plaintiff she has a history of depression dating as far back as age 13 as well as bipolar disorder, polysubstance abuse, and impulse control disorder. (Tr. 934, 961, 912). Plaintiff's substance abuse problems began at age 11. (Tr. 944, 914). As determined by the ALJ, her substance abuse problems are not significant to this claim. (Tr. 26). Plaintiff has Hepatitis C exposure due to intravenous drug use. (Tr. 463). Plaintiff complains of chest pain and discomfort which may be attributed to her Paraxysmal Atrial Fibrillation but also to her panic episodes and her gastric problems. (Tr. 450, 423, 654). Plaintiff has

been diagnosed with GERDs, Hypothyroidism and Hyperlipidimia.(Tr. 331-334).  Plaintiff was involved

in a major car accident at the age of 16 where she sustained trauma to the head and back area. (Tr. 849).

She also received third degree burns to her legs at age 25. (Tr. 761).   Plaintiff has undergone a

Tonsillectomy, Hysterectomy, and Cholecystomy. (Tr. 744). Plaintiff has smoked one pack of cigarettes

a day for 30 years. (Tr. 452).

> ### D.   Medical Evidence

**Family Health Centers**

In July 2002, Plaintiff visited the Family Health Centers with the primary concern of abnormal

uterine bleeding. (Tr. 287-289).  Plaintiff complained that she had been menstruating for over two weeks.

(Tr. 288). The nurse practitioner noted a history of Hepatitis C, GERD, Bipolar Disorder due to "chemical

imbalance," bronchitis, thyroid disease, hemorrhoids, and osteoarthritis. (Tr. 289). Additionally, it was

noted that Plaintiff was treated for bacterial vaginosis and a yeast infection just a few weeks prior to her

visit. (Tr. 287). Plaintiff also visited Family Health Centers again in July for an ear ache (Tr. 491) and for

a follow-up in August. (Tr. 490). In September she was ordered to have an EKG due to abnormal cardiac

rhythm. (Tr. 496). The follow-up in October for review of the EKG revealed abnormalities. (Tr. 489).

**Lee Memorial Health Systems**

On May 25, 2003, while pregnant Plaintiff presented herself to Lee Memorial Hospital complaining

of a racing heart. (Tr. 407-10,688-690, 695-97,698-99). An electrocardiogram and a maternal

echocardiogram were performed revealing Plaintiff was in Atrial Fibrillation, but no effects to the baby.

*Id.* She was given medication to no effect. *Id.* Consequently, Plaintiff was transferred to HealthPark

Medical Center to be monitored by a cardiologist. (Tr. 692). Upon arrival at HealthPark, Plaintiff was quite

tachycardic and hypertensive. (Tr. 694). Due to her inability to respond to beta blocker therapy, Plaintiff

was electrically cardioverted with 120 joules of biphasic synchronized electricity which resulted in normal sinus rhythm. *Id*. Plaintiff was ordered to have a Doppler test, and real time high resolution ultrasounds on her lower extremities to rule out deep venous thrombosis, which was found to be negative. (Tr. 679-680). She was also ordered to undergo a 2-dimensional echocardiography which revealed "well preserved left ventricular systolic contractillity, no significant valvular abnormalities and mildly dilated left atrium." (Tr. 681-82). Plaintiff was discharged from the hospital on May 26, 2003.(Tr. 688).

On July 4, 2003, Plaintiff once again presented herself to the ER with atrial fibrulation and rapid ventricular response. (Tr. 670). Staff attempted to restore sinus rhythm with intravenous medications but was not converted. (Tr. 673). Plaintiff underwent electrocardioversion, which successfully restored her to normal sinus rhythm. *Id.* Plaintiff was discharged on July 6 in improved stabilized condition and was placed on procainamide, Lanoxin and beta blockers to control her arrhythmia. (Tr. 669). Plaintiff again went to the ER on August 2 complaining of another episode of Atrial Fibrillation but was not admitted because she had normal sinus rhythm. (Tr. 664). Plaintiff was evaluated again on August 5 in relation to her scheduled cesarian section for which she was cleared to proceed. (Tr. 662-63). On the following day the cesarian section with bilateral partial salpingectomies was performed with no complications. (Tr. 660-61). Plaintiff was discharged on August 10, 2003, in a stable condition. (Tr. 657).

On April 19, 2004, Plaintiff had a laparoscopic cholecystectomy and liver biopsy performed at Lee Memorial Hospital. (Tr. 655-56). During the operation it was observed that Plaintiff's liver was mildly abnormal with signs of early cirrhosis. (Tr. 655). In May 2004, Plaintiff was admitted to the hospital for evaluation of her epigastric pain, which may have been angina equivalent as it was somewhat relieved by sublingual nitroglycerin. (Tr. 654). An EKG was performed revealing changes in T-waves from a previous EKG performed. *Id*. She presented to the ER again in June 2004 for a toe infection. (Tr. 645).

In 2005 Plaintiff presented herself to the ER on three occasions. (Tr. 637-644). In January for abdominal pain, in April for a rash and in December for right upper quadrant pain. (Tr. 643, 641, 637). On all occasions all tests conducted were negative and Plaintiff was discharged the same day. (Tr. 637-38,641-644). On March 2, 2005, Plaintiff underwent a esophagogastroduodenoscopy and colonoscopy with biopsies. (Tr. 639). These procedures revealed mild gastritis, small internal hemorrhoids, and a 2mm rectal polyp. (Tr. 640).

In February 2006, Plaintiff went to the ER for an insect bite. (Tr. 635). Due to her complaints of pelvic pain, irregular cycles, and pelvic adhesions a subtotal hysterectomy, bilateral salpingo-oophorectomy with extensive lysis of adhesion were performed on August 26, 2006. (Tr. 628-36). In July 2006, Plaintiff once again went to the ER with complaints of palpitations. (Tr. 626). Plaintiff was on a cardiac monitor which revealed no abnormalities in sinus rhythm. (Tr. 627). She went to the ER on two more occasions in 2006, once for an ear ache and once for neck, back and foot pain. (Tr. 622-27). Medications were prescribed and Plaintiff was discharged. (Tr. 622-27).

In December 2007 Plaintiff went to the ER for ear pain and was discharged with instructions on taking medications. (Tr. 620-621). On May 11, 2008, Plaintiff went to the ER for hand swelling after hitting it on a metal table. (Tr. 618). Plaintiff was told to keep her hand elevated and was prescribed pain medication. (Tr. 618-19). On May 24, 2008, Plaintiff once again went to the ER for anterior chest burning. (Tr. 616). She was admitted for telemetry monitoring, while under observation Plaintiff was able to eat a full meal. (Tr. 617).

**Florida Heart Associates**

Plaintiff's cardiac condition was monitored by Florida Heart Associates from 2003 through 2006. (Tr. 326-341, 407-485). In September 2003 post pregnancy, Plaintiff was ordered to wear a 24-Hour Holter

Monitor. (Tr. 481). The monitor revealed normal sinus rhythm and no episodes of atrial fibrillation, there were "rare atrial premature contractions and premature ventricular contractions" but there was no correlation between these symptoms and arrhythmia. *Id*.

On March 4, 2004, Plaintiff presented herself to the offices of Florida Heart Associates to establish continued cardiac care. (Tr. 463). She complained of chest pain and a stress test was ordered to evaluate her condition. (Tr. 465). The stress test was performed on March 22, 2004. (Tr. 470). The results indicated normal perfusion at rest and post exercise; an average exercise tolerance with no exercise induced chest discomfort; and the test was negative for ischemia. *Id*. On May 12, 2004, further tests were performed during hospitalization including: electrocardiogram; gated SPECT imaging; and a M-Mode two-dimensional echocardiogram with pulsed waves, continuous waves and color flow Doppler. (Tr. 467-68, 477). All tests revealed no abnormalities nor signs of ischemia or infraction. *Id*. There was also no evidence of mass, thrombus or pericardial effusion. *Id*. On May 27, 2004, Plaintiff had a post hospitalization follow up. (Tr. 459). Plaintiff was ordered to continue taking Sotalol and that no further cardiac evaluation for the chest pain was necessary. (Tr. 462). In December 2004, Plaintiff visited Florida Heart Associates requesting to discontinue her Sotalol treatment. (Tr. 455). Plaintiff discontinued the Sotalol medication and Lopressor was added to treat her hypertension. (Tr. 457).

On January 14, 2005, Plaintiff was seen again due to an episode of atrial fibrillation discovered after being admitted to Port Charlotte Hospital. (Tr. 451). Plaintiff was placed back on Sotalol with a follow-up in three months. (Tr. 451,454). In March, Plaintiff again had a follow up after a hospital visit for chest pain. (Tr. 447). She was advised if she continued to have episodes of chest pain alleviated with nitroglycerin the next step would be cardiac catherization. (Tr. 450). Plaintiff explained about possibility of chest pain due to anxiety and would forgo the catherization for now. *Id*. In August, Plaintiff visited the

Florida Heart Associates with complaints of chest pain and palpitations. (Tr. 439). It was noted that she had undergone cardiac catherization in April that revealed normal coronary arteries. *Id.* Plaintiff was advised to continue Sotalol and given reassurance. (Tr. 442). At a follow-up in September, it was noted that Plaintiff was stable and compensated. (Tr. 446). Although Plaintiff requested to have her medications decreased, the doctor hesitated to do so due to her maintaining good sinus rhythm on the current regimen. *Id*. In December, Plaintiff reported no further episodes of palpitations and reported "feeling great." (Tr. 435). Plaintiff was noted to be stable and compensated, therapeutic lifestyle changes were discussed. (Tr. 438).

On August 3, 2006, Plaintiff had a cardiovascular follow-up after being seen in the ER for palpitations. (Tr. 431). Plaintiff was ordered to have an updated echocardiogram to assess her left atrial size. (Tr. 434). Plaintiff was advised that her continued smoking may be the cause of her dysrhythmia. *Id.* The echocardiogram was performed on August 10, 2006, which revealed mild ventricular enlargement, mild mitral valve insufficiency, and mild tricuspid valve insufficiency. (Tr. 472). However, it was noted that no significant changes occurred since May 2004. *Id*. Plaintiff was scheduled to have an event recorder to assess her cardiac dysrhythmia. (Tr. 430). On follow up in September, it was noted that "the event monitor revealed sinus rhythm without any significant tachycardia or sinus bradycardia." (Tr. 424, 473-476). It was also noted that her chest pain is atypical and inconsistent with cardiac chest pain. (Tr. 423). Her BetaPace medication was decreased and she was asked to follow up in six months. (Tr. 426). In November, Plaintiff presented herself to the office after allegedly having two abnormal EKGs with Dr. Kamkar. (Tr. 327). An EKG was performed revealing unchanged results compared to those performed in 2004. (Tr. 329).

**Primary Care Physicians**

Dr. Naser Kamkar was Plaintiff's primary care physician between 2004 and 2008. (Tr. 291-325, 343-406). Most of the visits documented by Dr. Kamkar are for miscellaneous minor conditions such as yeast infections, recurrent coughs, ear aches and prescription refills. (Tr. 291-325, 343-406). In January 2005, Dr. Kamkar ordered Plaintiff to undergo an ultrasound on her abdomen after complaints of abdominal pain, which revealed normal results. (Tr. 316) In March 2005, Plaintiff complained of upper quadrant pain of two months duration, a CT scan was performed revealing no abnormalities. (Tr. 514). In November 2006, Plaintiff complained of abdominal pain. Dr. Kamkar again ordered CT scan of the abdomen and pelvis which revealed only minimal fatty infiltration of the liver. (Tr. 510-511). In May 2007, Dr. Kamkar ordered Plaintiff to have a chest x-ray for her recurrent cough. (Tr. 509). The X-ray revealed bronchitis. (Tr. 508). Dr. Kamkar indicated control and stabilization of her Hepatitis C and Atrial Fibrillation, (Tr. 316, 368) as well as her anxiety and depression. (Tr. 312, 294, 361, 383, 387). Several times it was noted Plaintiff was not compliant with requested labs or referrals. (Tr. 318, 321).  On July 8, 2008, upon the request of Plaintiff, Naser Kamkar, M.D., drafted a letter indicating she suffers from the following medical conditions: depression, anxiety, hypothyroidism, hepatitis C, IBS, obesity and DJD of the hands. (Tr. 744).

In 2009 and 2010, Plaintiff consulted with Dr. Alphonsus Zohlandt M.D., and Dr. Alonso Gonzalez M.D., complaining of arthritis pain and back pain. (Tr. 849-864). In September 2009, Plaintiff visited Dr. Zohlandt for the first time with complaints of arthritis pain in her neck and back at 9/10 pain level and needing medication refills. (Tr. 862). His notes revealed physical findings within normal range. (Tr. 862-863). Her mental status findings were within normal range and no indication of any psychological disorders were noted. (Tr. 863). Her follow up appointment with Dr. Zohlandt in November revealed no new

-12-

findings. (Tr. 853-855). Plaintiff complained of back pain at 10/10 level and Plaintiff stated she had seen a rheumatologist that "will not prescribe pain medications due to controlled substance problems." (Tr. 853).

On February 1, 2010, Plaintiff visited Dr. Gonzalez for the first time to establish a primary care physician, have her medications refilled and with complaints of back pain. (Tr. 851). Dr. Gonzalez noted both the upper and lower extremities had good and intact reflexes, sensitivity and motor strength. (Tr. 852). The doctor prescribed Relafen 500mg 3 times daily and Flexeril 10mg twice daily for her back pain. (Tr. 851).

**Dr. James Omalia**

Plaintiff consulted with James Omaila, M.D., a gastroentorologist, in September 2008 for complaints of rectal bleeding and abdominal pain. (Tr. 751). She also noted problems with heartburn, belching, nausea, bloating, and constipation. *Id*. Dr. Omalia noted everything in her physical examination within normal limits and ordered for Plaintiff to undergo a colonoscopy, an EGD, and a CASC. (Tr. 755).

**State Requested Evaluations**

In December 2008, Plaintiff was referred to Eshan M. Kibria, M.S., M.B.A., D.O., for an independent medical examination for Social Security Disability. (Tr. 761-62). During the examination Dr. Kibria noted Plaintiff appeared comfortable sitting, had negative Patrick's test, was able to raise her legs up to ninety degrees with no pain, and she was able to grip with her left hand 4/5 and 5/5 with the right. (Tr. 762). The doctor noted only "slight stiffness in her hands" and was "still able to hold a pencil and button a shirt with both hands." *Id*. Dr. Kibria also noted no pain in neck or shoulder motion although "slightly limited." *Id*. Her mental exam revealed a normal speech pattern as well as the ability to recall 2/3 objects after several minutes. *Id*.

Also in December 2008, Plaintiff underwent a Psychological Consultative Examination by Dr. J.L Bernard, J.D., Ph.D., ABPP, FACP. (Tr. 757-759). Dr. Bernard observed Plaintiff to have a good attitude, to be "rational, clear and logical" and was oriented to time and place. (Tr. 758). Dr. Bernard noted Plaintiff had driven herself and arrived on time to her evaluation. (Tr. 757). Additionally, Dr. Bernard noted that although she complained of low concentration and attention, Plaintiff scored 29 out of 30 on the Folstein Mini Mental State Exam which is contra to her indications. (Tr. 758). Although the doctor noted a GAF rating of 45, the remaining notes do not indicate such a score as Plaintiff presented herself to be clear and euthymic. *Id.*

In December 2008, Plaintiff's Range of Motion Report Form conducted by State Agency Personnel Jennifer Drieu, SDM, noted only slight limitations in some areas of the spine, wrist, hand, knee, ankle, foot, hip shoulders and elbows. (Tr. 763-65). The Physical RFC Assessment also conducted by Ms. Drieu in January 2009, limits Plaintiff's exertional activities to occasionally carry 20 pounds, frequently carry 10 pounds, standing/walking with normal breaks for 6 hours out of 8, sit 6 hours out of 8, and unlimited in pushing or pulling. (Tr. 781). Additionally, she noted no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 782-784).

A second Physical RFC Assessment was conducted by State Agency Consultant, Dr. Thomas Renny, D.O., in March 2009. (Tr. 828-835). Dr. Remy made the same exertional and visual limitation findings as Ms. Drieu. (Tr. 829, 831). However, Dr. Remy noted the following postural limitations: she may only frequently climb ramp or stairs, balance, stoop, kneel, crouch and occasionally crawl. (Tr. 830). He also limits Plaintiff in her manipulative abilities to fingering frequently and limits her hearing to frequently for the left side. (Tr. 831-32). Dr. Remy also noted environmental limitations to avoiding concentrated exposure to extreme cold and heat, humidity and noise. (Tr. 832).

-14-

A Psychiatric Review Technique Form was completed by State Agency Consultant, Dr. Arthur

Hamlin, Psy.D., in January 2009 and State Agency Consultant, Dr. Keith Bauer, PhD., in March 2009. (Tr.

766-779, 792-805). Both noted impairments of Personality Disorders and Substance Addiction Disorders

but not severe. (Tr. 766, 792). They both noted antisocial personality disorder as the personality disorder.

Both also noted only mild difficulty in maintaining social functioning, but noting no limitations in

maintaining concentration, persistence or pace, no restrictions of daily living and no episodes of

decompensation. (Tr. 776, 802).

**Lehigh Regional Medical Center**

On March 23, 2009, Plaintiff was admitted to Lehigh Regional Medical Center for chest pain,

suspected cardiac origin. (Tr. 806). An x-ray was taken of her chest, which showed no evidence of acute

cardiopulmonary disease or CHF, and a normal EKG was performed. (Tr. 808, 813). A metabolic panel

and hemogram/platelet count was performed with results within normal range, except low red blood cell

count, low hematocrit and high mean cell hemoglobin. (Tr. 814,815). It is noted that acute coronary

syndrome can be ruled out as the cause of her chest pain. (Tr. 811). Plaintiff was discharged on March 24,

2009. (Tr. 808).

**North Collier Hospital**

In 2009 and 2010, Plaintiff visited North Collier Hospital on several occasions. (Tr. 838-846). In

September 2009, Plaintiff presented herself complaining of a 3 day long headache. (Tr. 845). She received

a CT scan that revealed no abnormalities and was given medication which resolved the headaches. (Tr.

846). On April 8, 2010, Plaintiff presented herself at the hospital complaining of epigastric pain, chest pain,

vomiting and diarrhea. (Tr. 840, 843). Plaintiff received medication, a chest x-ray and EKG which did not

reveal any abnormalities. (Tr. 844). Plaintiff was admitted for telemetry observation and was hydrated with

IV fluids. (Tr. 841). In May 2010, Plaintiff once again presented herself to the hospital complaining of vaginal bleeding. (Tr. 838-39). She was found to have a superficial laceration which was packed and Plaintiff was released. (Tr. 839).

**Dr. Adam M. Shuster**

Plaintiff visited Dr. Adam M. Shuster, D.O., for pain management on two occasions in 2010. (Tr. 907). In his notes, Dr. Shuster insisted that "[he] did not believe long-term narcotic therapy is appropriate as a monotherapy in her condition." *Id.* Plaintiff complained of high pain levels and having no relief from the medications prescribed by Dr. Shuster. *Id.* Dr. Shuster advised plaintiff on the proper way of treating her arthritis and fibromyalgia. Meanwhile he prescribed Plaintiff Vicoprofen, a narcotic pain reliever, for treatment of her pain until Plaintiff was able to begin her fibromyalgia treatment with Lyrica. *Id.*

**Lee Mental Health Center**

Plaintiff was admitted to the Lee Mental Health Center on June 3, July 23 and August 12 in 2010. (Tr. 910-962). In June 2010, Plaintiff was voluntarily admitted for depression and suicidal ideations. (Tr. 951). At her intake assessment it was noted that she was alert, cooperative and oriented to all spheres. (Tr. 955). Plaintiff's long-term and short-term memory were in good condition but her insight and judgment was noted as poor. *Id.* The progress notes of her in-patient treatment indicate improvement, noting first a GAF of 40 on June 4, then a GAF of 45 on June 5, and finally a GAF of 55 by her date of discharge June 6. (Tr. 948-950).

In July 2010, Plaintiff was involuntarily confined under the Baker Act to Lee Mental Health Services after a drug overdose, indicating in her intake assessment that "she decided to self medicate, so I went to a doctor and he prescribed me a whole bunch of painkillers, and I proceeded to take them all." (Tr. 934, 943). During her discharge assessment, Plaintiff stated "it has been more difficult to cope with

stress lately because of financial issues, interpersonal problems with the mother, and having a six-year-old child to care for." (Tr. 936). The discharging physician noted that her insight, judgment and impulse control was improved. *Id.*

On July 29, 2010, and August 20, 2010, Plaintiff met with Dr. Gregory G. Young for pharmacologic management. (Tr. 928-929, 912-913). Both times he noted Plaintiff was well-groomed and cooperative. (Tr. 928, 912). Her speech was normal, mood was euthymic, affect was appropriate with goal directed thought processes and her insight and judgment were fair. *Id.*

In August 2010, Plaintiff was admitted into the DATE residential program with Lee Mental Health Services. (Tr. 910). She successfully completed the program and was discharged in early September. *Id.* In her discharge summary it was noted that she "has multiple strengths, including: outgoing, motivated, and a readiness to change." (Tr. 911). Plaintiff was advised to continue meeting with a psychiatrist regularly. *Id.*

### E.   Testimony

**Plaintiff Testimony**

At the hearing held on January, 6, 2011, the ALJ, Plaintiff, a Vocational Expert, a Medical Expert and Plaintiff's counsel were present. (Tr. 37). Plaintiff testified about her general background including age, weight, height and educational experience. (Tr. 57-59). Plaintiff testified to being single and living with her mother and minor child, age seven. (Tr. 58, 66). She attested to the fact that she could still prepare meals for herself and her child, and she was able to do some housework such as start and fold laundry.(Tr. 66-67). She also stated she attended an all women's AA meeting twice a week. (Tr. 67). She testified to her past work experience as a waitress, hostess, cashier, prep cook, and deli worker. (Tr. 60-61). When asked what was limiting her from performing simple jobs, she stated "I'm really starting to have some

serious problems with my feet and my arthritis." (Tr. 62).

Plaintiff testified to being diagnosed with Hepatitis C and associated symptoms of chronic fatigue, vomiting, diarrhea, and abdominal swelling to the condition. (Tr. 44-45).  She stated she was under supervision of a gastroenterologist for her diarrhea and nausea but she "quit going . . . [b]ecause I got tired of going to the doctors all the time." (Tr. 73). Plaintiff also testified that she had been diagnosed with rheumatoid arthritis due to a history of joint swelling in her hands for which she took Ibuprofen. (Tr. 45). She agreed that she was capable of performing simple activities with her hands such as using a fork and knife or buttoning her shirt, but alleged that she could not do those activities repetitively. (Tr. 46). Plaintiff testified that out of an hour she would only be able to use her hands repetitively for about 15 minutes. *Id*. She then testified that she had difficulty sitting and standing, stating she could only stand for 15 to 20 minutes before having to sit down and she could sit for less than 30 minutes. (Tr. 47-48). Additionally, she stated she would only be able to alternate between sitting and standing for a total of three hours and would require at least one and a half hours of laying down to be able to continue. (Tr. 48).

Plaintiff was then asked about her hypothyroidism, to which she attributed chronic fatigue although testifying she is under Synthroid treatment. *Id.* Plaintiff was asked about her atrial fibrillation and whether she was taking medication for it. (Tr. 48-49). She stated she was no longer on medication for atrial fibrillation and that she continues to have constantly irregular EKGs. (Tr. 49). She testified to having chest pains "four or five times a month" and requiring at least one and half hours to recover. *Id*. Plaintiff was then asked about her anxiety and panic attacks. (Tr. 49-50). When asked whether she could tell the difference between a panic attack and her atrial fibrillation, she testified "yeah, I'm starting to learn." (Tr. 50). She was then asked about her substance abuse problems and her recent DUI. (Tr. 51-52). She stated she was still under probation and has not had any positive screening tests for one and a half years. (Tr. 52).

She also stated she continues to attend AA. *Id.*

Plaintiff was then asked about her psychological impairments. (Tr. 63). She stated she was receiving psychotropic medication treatment and received counseling from a psychiatrist, Dr. Young through Lee Mental Health Center. *Id.* Plaintiff testified that she was diagnosed with impulse control problems and depression. (Tr. 69). When asked if her mental conditions have affected her jobs in the past, she stated "I couldn't handle the customers . . . I ended up getting very stressed out and . . . walking off the job," and "I get very argumentative." *Id.* She stated she had been fired on two or three previous occasions. *Id.* She testified to not being able to perform simple jobs with limited human interaction because she makes poor decisions and gets "panic attacks when placed in a responsibility role." (Tr. 70-71). She also attributed her mental impairments to causing poor concentration. (Tr. 71).

Plaintiff testified to being hospitalized for a drug overdose earlier in the year. (Tr. 72). She stated that it had been a suicide attempt because she was having "just a bad time" and was depressed. *Id.* She stated there was no specific stressor that brought it about and that her depression had improved since her hospitalization. (Tr. 73).

**Medical Expert Testimony**

Medical expert ("ME"), Dr. Steven Gerber, testified in reference to Plaintiff's physical limitations. (Tr. 43). Dr. Gerber stated that based on the medical evidence on record, Plaintiff did not meet or medically equal any of the listing of impairments. (Tr. 44). The ME stated the record documents a history of Hepatitis C, hypothyroidism, history of migraine, and obesity. (Tr. 53). He stated that there was no substantiation of a diagnosis of rheumatoid arthritis, but that he would limit Plaintiff to light exertional work with occasional postural limitations. *Id.* When examined by Plaintiff's counsel, the ME stated the symptoms the Plaintiff attributes to Hepatitis C are not substantiated because "Hepatitis C, in this case,

does not appear to be active. There is no abnormality-of-liver-function and no other indication other than exposure." (Tr. 54). Dr. Gerber also stated that based on the treating cardiologist's record Plaintiff's atrial fibrillation is "stable," "controlled" and "infrequent". *Id*. He testified as to her hypothyroidism and her attributed symptoms, stating there is no indication on record of "under-treatment" and thus her symptoms could not be attributed to it. (Tr. 56). Dr. Gerber went on to state that the symptoms complained of by Plaintiff were not substantiated by the medical record. (Tr. 56-57).

**Vocational Expert Testimony**

Vocational Expert, Ms. Joyce Ryan, testified at the hearing. (Tr. 75-87). She testified to the level of skill and exertion required by Plaintiff's past relevant work listing all as either light or sedentary in exertion and semi-skilled to skilled. (Tr. 77-79). The ALJ then asked the VE whether given Plaintiff's age, education, background, and experience and assuming a person has the capacity for light exertional work, with occasional limitations on postural activities, no repetitious or continuous use of the upper extremities, no power-grasping or torquing, would this person be able to perform any of the Plaintiff's past relevant work.(Tr. 79-80). The VE stated that the hypothetical person should be able to perform as a cash accounting clerk, waitress and cashier. *Id*. The VE was also asked to identify other jobs in the national economy that Plaintiff could perform given those limitations. (Tr. 80-81). Ms. Ryan stated there are positions in the national economy such as cleaner and mail room sorter that were light. (Tr. 81). The ALJ then added a limitation of ninety percent of an average workers concentration, pace and persistence and asked what effects that limitation would have on any of the jobs previously mentioned. *Id*. The VE stated that only the accounting clerk position would be compromised. *Id*. The ALJ additionally added another limitation of ninety percent of the average workers social interaction. (Tr. 82). The VE stated that it would again only affect the accounting clerk position. *Id*. The ALJ added a fourth hypothetical where instead the

person would have moderate limitations in concentration, persistence, and pace, to which the VE stated it would have the same effects as the previous hypothetical. *Id*.

Plaintiff's counsel asked the VE whether someone who required using the restroom four to five times during an eight hour work day, two to three times a month, would be able to perform unskilled work.(Tr. 83).  The VE expert stated that due to lack of coverage some jobs such as the cashier position may be affected but waitressing, cleaning, and bookkeeping clerk would not. (Tr. 83-84). The VE then testified that these jobs would generally require seven hours of standing. (Tr. 85). Counsel then asked what effects would having marked social functioning three to four times a month have on these jobs. *Id.* The VE stated it would not be tolerated if it was disruptive with any jobs where you are dealing frequently with people, but the cleaner position would not be affected. (Tr. 85-86).

## III.    Specific Issues and Conclusions of Law

Plaintiff only raises one issue on appeal. As stated by Plaintiff: The ALJ erred by substituting his opinion for expert medical opinion evidence and/or the ALJ's findings regarding the Plaintiff's psychiatric impairment are not supported by substantial evidence.

### A. Whether the ALJ's opinion is supported by substantial evidence.

Plaintiff argues that the ALJ committed error by characterizing the Plaintiff's 2010 hospitalizations as temporary exacerbations related to concrete stressors. In so doing, Plaintiff further argues that the ALJ substituted the medical expert's opinions for his own. Consequently, the ALJ's decision as to the Plaintiff's psychological limitations[1] is not supported by substantial evidence.

---

[1] Plaintiff does not raise any issues or arguments with the ALJ's evaluation of Plaintiff's physical condition. Neither party to this cause has addressed any issues on the substantial evidence supporting the ALJ's finding that Plaintiff retained the RFC for light work with some postural and manipulative limitations. If Plaintiff fails to raise an argument in the District Court, she waives the right to raise that argument on Appeal. *Persichilli v. Commissioner of Social Sec. Admin.,* 246 Fed. Appx. 613, 615 (11th Cir. 2007).

In the instant case the ALJ considered all of the evidence on record in determining Plaintiff's RFC. The ALJ noted that although Plaintiff reported having a long history of depression dating as far back as age 13 and personality disorder diagnosed around age 30, the record regarding these conditions "is sparse and does not support functional limitations of the degree alleged due to psychiatric symptoms . . ." (Tr. 25). There are various notations indicating depression or bipolar disorder, as well as indications of Plaintiff's medication regimen; including various psychotropics. (Tr. 25, 289, 291, 293-94, 296, 299, 306, 312, 316, 318, 321, 333 etc.). However, there is no medically acceptable clinical and laboratory diagnostic techniques supporting the alleged limitations. *Id.* Additionally, treatment notes indicate her depressed condition improved with medication. (Tr. 345, 361, 401, 496, 700-01).

At the hearing, Plaintiff testified to having psychiatric evaluations by Dr. Young and receiving her principal mental health treatment from Lee Mental Health Centers. (Tr.63-64) Nonetheless the record only presents two progress notes from Dr. Young, one dated July 20, 2010, and one dated August, 20, 2010. (Tr. 912-13, 928-29). Additionally, although there is extensive medical evidence on record for her physical conditions, the only medical evidence submitted in support of her psychiatric conditions are the records from her in-patient treatments in 2010. (Tr. 909-961).

Plaintiff further argues that the ALJ substituted his opinion for that of the medical experts by characterizing the Plaintiff's hospitalizations as temporary exacerbations. However, the ALJ did not substitute any medical opinion for his own. Although the ALJ did state " . . . these incidents were related to temporary exacerbations directly correlated to concrete stressors in the claimant's life . . . and are not representative of the typical severity of the claimant's psychiatric symptoms," this was not a substitution of any medical evidence. In fact, the statement is supported by the medical notes taken while Plaintiff was under treatment, including: "Client reports she is currently stressed about her financial situation and her

legal issues(Tr. 918)," "[s]he said it is more difficult to cope with stress lately because of financial issues, interpersonal problems with the mother, and having a six-year-old child to care for (Tr. 936)," "it's hard moving in with your mother (Tr. 941)," "[a]nother stressor is financial limitations (Tr. 951) ," and "Client reports feeling frustrated that her financial situation has made her have to move back in with her mother, [she] states that she was in a relationship for three months but that it ended yesterday . . ." (Tr. 961). Thus, the ALJ did not give his own personal opinion but rather gave an interpretation of what the medical evidence indicated. Although the Plaintiff denied specific stressors bringing about the need for hospitalization, she did state it was "just a bad time" and that her depression had improved since her hospitalizations. (Tr. 72-73). Although Plaintiff argues that these three isolated incidents are strong evidence of marked limitations in occupational functioning substantial evidence of record supports the periodic exacerbation finding made by the ALJ.

Plaintiff further indicates that the ALJ should have requested medical expert opinion for her psychiatric symptoms. Nonetheless, the ALJ is not obligated to seek expert opinion before making his RFC findings when the record provides substantial evidence to support the ALJ's determinations. *See Wilson v. Apfel*, 179 F.3d 1276, 1278 (11th Cir. 1999). Plaintiff additionally failed to make a request for a medical expert and to show that such testimony was necessary at the hearing. *See McLaughlin v. Astrue*, No. 8:08-CV-2047-T-TGW, 2009 WL 4573456, at 3 (M.D. Fla. Dec. 7, 2009) (unpublished). Therefore, the ALJ properly found that Plaintiff was only slightly limited in her concentration, persistence and pace and moderately limited in appropriate social functioning.

IV.     **Conclusion**

Accordingly, the ALJ's decision is consistent with the requirements of the law and supported by substantial evidence. Therefore, the decision of the Commissioner is **AFFIRMED** pursuant to sentence four of 42 U.S.C. §405(g). The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Chambers in Ft. Myers, Florida this 7th  day of November, 2012.



_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies:
All Parties of Record.